**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| IN RE MARQUIS SOFTWARE SOLUTIONS, INC. DATA BREACH LITIGATION | No.: 4:25-CV-01277-ALM<br><br>**JURY TRIAL DEMANDED** |

### PLAINTIFFS' FIRST CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Kristin Bowles, James Dull, Marlene Ehler, John Hamisch, Robert Harris, Edward Hellyer, Kathleen Matlock, Stanley Piszczor, and Joseph Ridout ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this Consolidated Class Action Complaint against Defendants Marquis Software Solutions, Inc. ("Marquis") and SonicWall Inc. ("SonicWall") (collectively, "Defendants"). Plaintiffs allege the following based on personal knowledge of facts, upon information and belief, and based on the investigation of counsel as to all other matters.

### INTRODUCTION

1. Plaintiffs and the proposed Class Members bring this class action lawsuit on behalf of all persons whose confidential and sensitive Personally Identifiable Information ("PII" or "Private Information")[1] was impacted in a data breach experienced by Defendants on or around August 14, 2025 (the "Data Breach" or the "Breach").

2. Plaintiffs' claims arise from Defendants' failure to adequately secure and safeguard Private Information that was entrusted to them, and their accompanying responsibility

---

[1] Personally identifiable information generally incorporates information that can be used to distinguish or trace an individual's identity, either alone or when combined with other personal or identifying information. 2 C.F.R. § 200.79. At a minimum, it includes all information that on its face expressly identifies an individual.

to store and transfer that information while preserving its confidential nature.

3.      Marquis touts itself as providing sophisticated, specialized data-driven analytics and marketing automation tools and compliance management software tailored for use by regulated financial lending institutions to over 700 banks and credit unions across the country ("Marquis' Clients" or "Clients").

4.      SonicWall is a cybersecurity software vendor whose suite of products includes firewalls, VPNs, and other network security management products including cloud-based data solutions, as well as analytics software.

5.      As a necessary aspect of providing its data management, analytics, compliance and advisory services to its financial institution Clients, Marquis collects, uses, and stores the Private Information of its Clients' customers.

6.      Marquis retained SonicWall as a cybersecurity vendor and uses, among other products, SonicWall's firewall cloud backup service. Since 2025, Marquis has hired SonicWall and used its firewall cloud backup service in its company headquarters and a company data center.

7.      Marquis provides components of its employees' multi-factor authentication ("MFA") credentials to SonicWall (MFA scratch codes), which  allows anyone with access to that information to use it to access the unencrypted Private Information that Marquis keeps in its custody and care.

8.      On August 14, 2025, a third-party threat actor executed a ransomware attack on Marquis, gaining unauthorized access through what is believed to be a vulnerable firewall to the company's network and client data. The threat actor accessed and obtained confidential and sensitive PII belonging to Plaintiffs' and Class Members' from Defendant's network and systems. The impacted data included personally identifiable information for customers of some of

Marquis' financial institution clients, confidential information that Marquis' Clients provided to Marquis to facilitate the delivery of Marquis' services.

9.  Marquis ultimately determined that the cybercriminals accessed Marquis' network by exploiting a vulnerability in a firewall product provided by SonicWall. The threat actors then used unencrypted firewall configuration files and credentials taken from SonicWall to access Marquis' network on which Plaintiffs' and Class Members unencrypted Private Information was stored.

10.  In November 2025, SonicWall admitted to Marquis that the SonicWall cloud data breach had been ongoing since February 2025, when SonicWall made a code change to its application programming interface ("API") that created a vulnerability exploitable by threat actors.

11.  SonicWall's cloud backup breach provided threat actors with access to critical data, including credentials and MFA scratch codes, that enabled them to bypass firewalls and gain access to Marquis' networks. The data breach that Marquis suffered on August 14, 2025, occurred because the SonicWall cloud breach allowed cybercriminals to bypass Marquis' firewalls provided by SonicWall. Marquis in turn negligently failed to detect the unauthorized intrusion.

12.  Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to SonicWall and Marquis, and the potential for such vulnerabilities in SonicWall's products was a known risk to Marquis. Thus, Defendants knew that failing to take reasonable steps to secure the Private Information left them in a dangerous and vulnerable condition. Indeed, Defendants, sophisticated software companies bound to specific safeguards for Private Information under federal law, knew the importance of proper data protection and were on notice that their systems

3

were vulnerable.

13.    Upon information and belief, the failures and negligence by Defendants led directly to Plaintiffs and Class Members' Private Information being compromised in the Data Breach including names, dates of birth, account numbers, Social Security Numbers, and tax identification numbers. Essentially all the data that a threat actor needs to cause identity theft and wreak havoc on the unsuspecting customers.

14.    Defendants failed to take adequate precautions to keep individuals' Private Information secure. Upon information and belief, Defendants failed to adequately protect the storage of Marquis' employee credential information for employees whose credentials provided direct access to Plaintiffs' and Class Members' Private Information. Furthermore, upon information and belief, Marquis failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to encrypt or redact this highly sensitive data when it was maintained on Defendants' systems. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless acts and omissions and their failure to adequately protect Plaintiffs' and Class Members' sensitive data.

15.    The sensitive nature of the data maintained by Defendants and potentially compromised in the Data Breach, shows that Plaintiffs and Class Members have suffered irreparable harm. Plaintiffs and Class Members have lost the ability to control their Private Information and are now subject, due to Defendants' negligence and malfeasance, to actual and increased risk of identity theft.

16.    Marquis was negligent and breached its duties and obligations by failing in one or more of the following ways: (a) to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (b) to design, implement, and maintain reasonable data

retention policies; (c) to effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; (d) adequately vet and audit vendors responsible for data retention and security, including SonicWall; (e) to adequately train employees regarding data security; (f) to comply with industry-standard data security practices; (g) to timely warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (h) to encrypt or adequately encrypt sensitive information that was stored on Defendant's servers; (i) to timely recognize or detect that its servers had been compromised and accessed in a timely manner to mitigate the harm; (j) to utilize widely available software able to detect and prevent this type of attack; (k) to limit access to Plaintiffs' and Class Members' sensitive data; and (l) to timely notify Plaintiffs and Class Members of the Data Breach. Defendant Marquis' conduct amounts to at least negligence and violates federal and state statutes.

17.    Defendant Marquis was further negligent and breached its duties and obligation to Plaintiffs and Class Members by: (a) failing to properly monitor its network for unauthorized access by threat actors; (b) failing to prohibit unauthorized access to its network; (c) failing to take the proper and necessary precautions in monitoring its network to prevent unauthorized intrusions; (d) failing to properly train and/or supervise its employees, contractors, subcontractors, and/or agents responsible for code implementation and monitoring of its network; (e) failing to recognize or detect that its SonicWall firewall product(s) had been compromised in a timely manner to mitigate the harm; (f) failing to utilize widely available software able to detect and prevent this type of attack; and (g) failing to timely notify Plaintiffs and Class Members of the Data Breach.

18.    Defendant SonicWall was negligent and breached its duties and obligations in one or more of the following ways: (a) failing to effectively secure the firewall cloud backup product

issued to Marquis which it knew or reasonably should have known that Marquis used for data security using reasonable and adequate security procedures free of vulnerabilities and incidents; (b) failing to take the proper and necessary precautions in monitoring the portion of its network containing the firewall cloud backup product to prevent unauthorized access; (c) failing to timely warn Marquis of the vulnerabilities in its firewall cloud backup product(s), and (d) failing to timely disclose that the portion of its network containing the firewall cloud backup products had been compromised by threat actors.

19.    On or about November 17, 2025, Marquis issued its first public disclosure about the Data Breach.

20.    By obtaining, collecting, using, and storing the Private Information of Plaintiffs and Class Members, Defendants assumed legal and equitable duties to protect and safeguard that information from unauthorized access and intrusion.

21.    Defendants owed Plaintiffs and Class Members a duty to take all reasonable and necessary measures to keep the Private Information collected safe and secure from unauthorized access. Marquis solicited, collected, used, and derived a benefit from their Private Information.

22.    Defendants, despite having the financial wherewithal and personnel necessary to prevent the Data Breach, nevertheless failed to use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information they maintained for Plaintiffs and Class Members, causing the exposure of Plaintiffs' and Class Members' Private Information.

23.    As a direct and proximate result of Defendants' inadequate data security and negligence as well as breaches of their duties to handle Private Information with reasonable care, Plaintiffs' and Class Members' Private Information was accessed by cybercriminals and exposed to an untold number of unauthorized individuals. Plaintiffs and the Class Members have suffered

and will continue to suffer concrete injuries including: (a) unreimbursed financial losses caused by misuse of their Private Information; (b) the loss or diminished value of their Private Information as a result of the Data Breach; (c) lost time spent dealing with the actual misuse of the compromised data, including time spent dealing with fraudulent credit card charges, and lost time spent detecting and preventing identity theft; (d) actual identity theft and fraud; (e) financial costs incurred due to actual identity theft; (f) loss of time incurred due to actual identity theft; (g) deprivation of value of their Private Information; (h) loss of privacy; (i) emotional distress including anxiety and stress in dealing with the Data Breach; and (j) the continued risk to their sensitive Private Information, which remains in Defendant's possession and subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect it. The risk of identity theft caused by this Data Breach is impending and has materialized, as there is evidence that the Plaintiffs' and Class Members' Private Information was targeted, accessed, misused, and disseminated on the dark web.

24.    The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes. Mitigating that risk, to the extent even possible, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

25.    Plaintiffs bring this action on behalf of themselves and all persons whose Private Information was compromised as a result of Defendants' failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) effectively secure hardware containing protected Private Information using reasonable and adequate security procedures free of vulnerabilities and incidents; and (iv) timely notify Plaintiffs and Class Members of the Data

Breach. Defendants' conduct amounts to at least negligence and violates federal and state statutes.

26.     Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen because of the Data Breach and who remain at risk due to Defendants' inadequate data security practices.

## PARTIES

### *Plaintiffs*

27.     Plaintiff Kristin Bowles is a natural person and citizen of Bakersfield, California.

28.     Plaintiff James Dull is a natural person and citizen of Chiefland, Florida.

29.     Plaintiff Marlene Ehler is a natural person and citizen of Appleton, Maine.

30.     Plaintiff John Hamisch is a natural person and citizen of Bakersfield, California.

31.     Plaintiff Robert Harris is a natural person and citizen of Fryeberg, Maine.

32.     Plaintiff Edward Hellyer is a natural person and citizen of Crystal River, Florida.

33.     Plaintiff Kathleen Matlock is a natural person and citizen of Lindale, Texas.

34.     Plaintiff Stanley Piszczor is a natural person and citizen of Antigo, Wisconsin.

35.     Plaintiff Joseph Ridout is a natural person and citizen of San Rafael, California.

### *Defendants*

36.     Marquis Software Solutions, Inc. is a Texas corporation with its headquarters and principal place of business located at 6509 Windcrest Drive, Suite 170, Plano, Texas 75024.

37.     SonicWall, Inc. is a Delaware corporation with its headquarters and principal place of business located at 1033 McCarthy Blvd, Milpitas, California 95035.

## JURISDICTION AND VENUE

38.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness

Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) the Plaintiffs and numerous Class Members are diverse from Defendants, and (4) there are more than 100 Class Members. Defendant Marquis is a citizen of Texas.

39.    The Court has personal jurisdiction over Marquis because Marquis has its principal place of business in Texas and regularly conducts business in Texas.

40.    The Court has personal jurisdiction over SonicWall because SonicWall regularly conducts business in Texas, has sufficient minimum contacts in Texas, and the acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Texas. On information and belief, SonicWall was previously owned by Dell Inc. and maintained a headquarters in Texas. Since its spinoff from Dell, SonicWall has continued to sell through Dell, including in Marquis' case, and on information and belief, maintains employees and a physical presence in Texas.

41.    Venue is proper in this District of Texas pursuant to 28 U.S.C. § 1391(b)(1) because Marquis' principal place of business is in this District, and much of the conduct alleged in this complaint is believed to have occurred in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events and/or omissions giving rise to the claims herein emanated from within this District, including the Data Breach.

## FACTUAL ALLEGATIONS

### A. Defendants Collected, Maintained, and Shared Plaintiffs' and Class Members' Private Information.

42.    Marquis is a software and financial technology vendor company that provides data management, analytics, and advisory services to hundreds of bank and financial services Clients across the country.

43.    SonicWall is Marquis' cybersecurity software third-party vendor that provides

9

Marquis with, among other products, a firewall product to protect its network from unauthorized intrusions.

44.    Plaintiffs and Class Members are consumers and current and former customers of Marquis' Clients, who received banking services from Defendants' Clients prior to the Data Breach. As a condition of obtaining banking services, Plaintiffs and Class Members were required to entrust their sensitive, non-public Private Information to Defendant Marquis' Clients and through those Clients, to Marquis. Defendants in turn stored and used Plaintiffs' and Class Members' Private Information to provide the contracted services to Clients.

45.    As a necessary aspect of providing its data management, analytics, and advisory services to Clients, Marquis collects, uses, and stores the Private Information of Defendant's Clients' customers, including Plaintiffs and Class Members.

46.    Marquis acquired and used Plaintiffs' and Class Members' Private Information to operate its for-profit business and could not do so without Plaintiffs' and Class Members' data. Indeed, Marquis generated its revenue from Plaintiffs' and Class Members' Private Information as it was paid specifically to manage, store, analyze, and report on this data pursuant to Defendant's contracts with its Clients.

47.    SonicWall likewise derived economic benefits from Plaintiffs' and Class Members' Private Information, as its suite of advertised firewall products were designed specifically to *protect* precisely this kind of sensitive information. A firewall is "[a] device or program that controls the flow of network traffic between networks or hosts" in order to "prevent unauthorized accesses to or from a private network."[2] Put differently, "[a] firewall around a

---

[2] *Firewall*, Nat'l Inst. Standards & Tech., https://csrc.nist.gov/glossary/term/firewall (last visited Feb. 23, 2026).

computer or network is like the wall around a castle or city.  It protects the computer or network by limiting points of access and providing criteria that must be met before being allowed to enter."[3]  SonicWall markets to its customers that "[t]he SonicWall TZ series of firewalls is designed specifically for the needs of SMBs and branch locations, delivering enterprise-class security without the enterprise-grade complexity," and that TZ Series firewalls "[p]rotect your small business or branch location from intrusion, malware and ransomware with an easy-to-use, integrated security solution designed specifically for your needs."[4]

48.    On information and belief, in exchange for receiving Plaintiffs' and Class Members' Private Information, Defendant Marquis made promises and representations to its Clients and their customers that the Private Information collected from them would be kept safe and confidential, that the privacy of that information would be maintained, that the data would be used only for authorized and legitimate purposes, and that Defendant Marquis would delete such information from their systems once there was no longer a need to maintain it.

49.    Marquis' Privacy Policy represented that:

> At Marquis Software Solutions Inc., we respect your privacy, and work hard to protect your personal information. . . . We build security into our services in order to protect your information. We use commercially reasonable and appropriate safeguards to secure and protect the privacy, accuracy, and reliability of your information and to protect it from unauthorized access, alteration, disclosure, or destruction.[5]

50.    Similarly, SonicWall's Privacy Policy provides that:

> SonicWall, Inc. and its affiliates and subsidiaries ("SonicWall," "we," "us," or "our") respect your privacy. . . . We use a variety of

---

[3] *How Firewalls Work*, Bos. Univ. TechWeb, https://www.bu.edu/tech/about/security-resources/host-based/intro/ (last visited Feb. 26, 2026).

[4] *Introducing Gen 8 TZ Series Next-Generation Firewall (NGFW)*, SonicWall, https://www.sonicwall.com/products/firewalls/entry-level (last visited Feb. 26, 2026).

[5] Privacy Policy, Marquis, https://gomarquis.com/privacy-policy (last visited March 19, 2026).

11

physical, administrative, and technical safeguards designed to help protect Personal Information from unauthorized access, use and disclosure.[6]

51.    In addition, SonicWall expressly advertises itself and its products as "revolution[ary]" and "advanced" cybersecurity products designed to protect sensitive data from threat actors.[7] SonicWall further describes itself as "a cybersecurity forerunner with more than 30 years of expertise [that] is recognized as a leading partner-first company."[8] SonicWall claims that its firewall models provide "[b]est-in-class [t]hreat [p]rotection," "[e]nterprise-grade protection," and "[u]nrivaled threat protection," that its "firewalls deliver proven security, performance, and simplicity for modern networks," and that they are "[d]esigned for stronger protection, easier management, and long-term resilience as threats evolve."[9]

52.    Defendants' Privacy Policy demonstrates that Defendants understood they held sensitive data requiring protection. However, contrary to their representations in their privacy policies, Defendants failed to implement adequate security measures to protect Plaintiffs' and Class Members' Private Information from unauthorized access by third parties.

53.    Plaintiffs and Class Members provided their Private Information to Defendant Marquis, either directly or indirectly, with the reasonable expectation and on the mutual understanding that Defendant Marquis, or anyone in Defendant Marquis' position would comply with their obligations to keep such information confidential and secure from unauthorized access.

54.    As a result of collecting and storing the Private Information of Plaintiffs and Class

---

[6] Privacy Statement, SonicWall, https://www.sonicwall.com/legal/privacy-statement

[7] *See, e.g.*, SonicWall, https://www.sonicwall.com/products/capture-advanced-threat-protection

[8] *SonicWall Report Finds Misconfigurations Driving Surging Cyberattacks in 2025*, SonicWall (Sept. 16, 2025), https://www.sonicwall.com/news/sonicwall-report-finds-misconfigurations-driving-surging-cyberattacks-in-2025.

[9] *Network Security Firewalls*, SonicWall, https://www.sonicwall.com/products/firewalls (last visited Feb. 26, 2026).

Members for its own financial benefit, Defendant Marquis had a continuous duty to adopt and employ reasonable measures to protect Plaintiffs' and the Class Members' Private Information from disclosure to third parties, and to audit, monitor, and verify the integrity and cybersecurity of its systems storing Private Information.

**B. Defendants Had Duties to Protect Plaintiffs and Class Members' Private Information.**

55.    Defendants had and have obligations promulgated by the Federal Trade Commission ("FTC") Act, common law, contract, and industry standards, to keep Plaintiffs' and Class Members' Private Information confidential and protected from unauthorized disclosure.

56.    Additionally, by obtaining, using, and benefitting from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known they were responsible for protecting that Private Information from unauthorized access and disclosure.

57.    Defendants also owed a duty to protect Plaintiffs and Class Members from the harm that insufficient data security and the consequential exposure of Private Information would cause, because such harm was foreseeable and reasonably preventable.

58.    Defendants knew they were storing valuable, sensitive Private Information and that as a result, their systems would be an attractive target for cybercriminals who exploit Private Information for its value in committing fraud and identity theft.

59.    Defendants also knew that any breach of Marquis' network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into their private and sensitive financial matters.

60.    Defendants' duty to protect Plaintiffs and Class Members from the foreseeable risk

13

of injury obligated Defendants to implement reasonable practices to keep Plaintiffs' and Class Members' sensitive Private Information confidential and securely maintained, to use and disclose it for necessary and authorized purposes only, to delete the data from network systems or applications when no longer necessary for legitimate business purposes, and to train employees on reasonable cybersecurity red flags and protection techniques.

61.    Defendants owed and still owe the foregoing duties to protect Private Information in their custody from unauthorized disclosure, and Defendants had the practical ability to fulfill those duties—yet, they failed to do so, allowing the Data Breach to occur.

## C. The Data Breach

62.    On August 14, 2025, Marquis detected suspicious activity on its computer network. As subsequently reported by Marquis in the notice letters sent by it and its Clients, on August 14, 2025, a security incident occurred at Marquis during which an external actor/system obtained unauthorized access to certain portions of Marquis' data environment.

63.    The PII that Defendants stored on Marquis' network systems and inadequately protected by SonicWall's firewall when the Data Breach occurred included the unencrypted PII of Plaintiffs and Class Members.

64.    Upon information and belief, and as reported by Marquis and its Clients, the PII belonging to Plaintiffs and Class Members stolen during the breach included: names, addresses, dates of birth, Social Security numbers, tax identification numbers, and financial account information.

65.    The cybercriminals responsible for the Data Breach gained access to Marquis' network through a vulnerability in SonicWall's firewall product. SonicWall offered a "cloud backup" service, through which SonicWall stored its customers' backup firewall configurations.

14

The cloud backup service was a feature where firewalls would automatically upload configuration backups to SonicWall's cloud infrastructure.  The backups were stored in an S3 bucket on Amazon's infrastructure, maintained by SonicWall.  The primary purpose of this service was to provide customers with off-site backup copies of their firewall configurations, allowing them to recover settings in case of device failure or the need to migrate configurations to new hardware. These backup files could be used and imported to another platform.

66.    From at least February 2025 through September 2025, a threat actor gained unauthorized access to SonicWall customers' backup firewall configurations by exploiting a vulnerability that SonicWall had introduced through a code change to its API in February 2025.

67.    Among the firewall backups downloaded by the cybercriminals during this extended hack was Marquis' firewall backup, which had exposed everything in Marquis' firewall, including access credentials and MFA scratch codes.

68.    Between about October 27, 2025, and November 25, 2025, Marquis notified its affected Clients about the Data Breach and the potential involvement of PII it collected from the Clients. Subsequently, on or about December 15, 2025, Marquis and its Clients began sending notice letters to Plaintiffs and Class Members—over four (4) months after Marquis detected the breach. During this period, Plaintiffs and Class Members were unaware their Private Information had been compromised and were unable to take protective measures.

69.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive, unencrypted information they were maintaining for Plaintiffs and Class Members, causing the exposure and theft of such data.

**D.  Defendants' Failure to Adequately Safeguard Plaintiffs and Class Members' Private Information Caused the Data Breach.**

70.    Plaintiffs' and Class Members' Private Information was targeted, accessed, and

15

stolen by cybercriminals in the Data Breach. Defendants' deficient security for customers' data caused and allowed criminals to target and take files containing Plaintiffs' and Class Members' inadequately protected, unencrypted Private Information from Defendant's care without detection until the damage was done.

71.     Plaintiffs' claims arise in part from Defendants' failure to implement industry standard security safeguards and adequately protect the confidential PII belonging to Plaintiffs and Class Members, and that was in Defendants' custody and care at the time of the Data Breach, from unauthorized access.

72.     As the Data Breach and its timeline evidences, Marquis failed to take reasonable precautions and did not use reasonable security measures to keep secure the sensitive PII it collected from its Clients, such as encrypting the information; deleting the data from the server when it was no longer needed; revoking employee user accounts' access to servers storing PII when such access was no longer needed; restricting access to the servers storing PII to only employees that are necessary and adequately trained to prevent unauthorized use of their login credentials; training employees about cybersecurity and attempts to gain unauthorized access; investigating and addressing vulnerabilities in its data security practices; and/or implementing the necessary safeguards to identify malicious activity. These failures allowed and caused cybercriminals to target Marquis' systems and carry out the Data Breach.

73.     Furthermore, SonicWall breached its duties and obligations by failing in one or more of the following ways: (a) to effectively secure the firewall backup cloud product issued to Marquis which it knew or reasonably should have known that Marquis used for data security using reasonable and adequate security procedures free of vulnerabilities and incidents; (b) to timely warn Marquis and its Clients' customers, including Plaintiffs and Class Members, of the

16

vulnerabilities in its firewall cloud backup product(s); (c) to properly monitor its network for unauthorized access by threat actors; (d) to prohibit unauthorized access to its network; (e) to take the proper and necessary precautions in monitoring its network to prevent unauthorized intrusions; (f) to properly train and/or supervise its employees, contractors, subcontractors, and/or agents responsible for code implementation and monitoring of its network; (g) to recognize or detect that its firewall cloud backup product(s) had been compromised in a timely manner to mitigate the harm; (h) to utilize widely available software able to detect and prevent this type of attack; and (i) to timely notify Marquis that its network containing Marquis' firewall configuration had been breached. Defendant SonicWall's conduct amounts to at least negligence and violates federal and state statutes.

74.    Specifically, the vulnerability in SonicWall's firewall cloud backup service was a result of a code change that SonicWall made to its application programming interface ("API") that created a vulnerability exploitable by threat actors. This vulnerability allowed anyone with a device serial number, which can be generated by algorithm and are generally predictable, to download SonicWall's customers' configuration backups without using any SonicWall credentials.  Furthermore, SonicWall had stored its customers' MFA scratch codes within the configuration backup files without encrypting them.

75.    As a self-proclaimed cybersecurity forerunner, SonicWall had reason to know that using predictable device serial numbers created a foreseeable vulnerability that threat actors could—and did—easily exploit. SonicWall's reckless use of easy-to-predict, easy-to-brute-force serial numbers constitutes a marked failure to implement reasonable and appropriate security measures to prevent unauthorized disclosure of its customers' protected data.

76.    In addition, SonicWall had reason to know that backing up its customers' MFA

17

scratch codes without encrypting them left its customers vulnerable to cybertheft. As SonicWall knew or should have known, MFA scratch codes within the stolen configurations could be used to bypass MFA requirements in customer firewalls.  MFA scratch codes are one-time-use codes to bypass MFA in the event of an emergency where the user may not be able to access their dual-factor authentication device or application.  Exposure of MFA scratch codes poses a clear and substantial risk to a company using MFA in conjunction with its SonicWall firewall.  SonicWall's failure to encrypt the scratch codes is an egregious departure from the normal standard of care expected of a company in SonicWall's position.

77.    The configuration backups that the SonicWall breach compromised contained numerous pieces of sensitive data that could be leveraged to facilitate an attack against SonicWall users.  SonicWall has admitted publicly and privately that the information could include unencrypted MFA scratch codes, unencrypted usernames, SSL certificate information, local firewall and linked customer domain encrypted username passwords, firewall rules, and overall configuration information.  As one industry source reported, the backups that SonicWall exposed "contained sensitive configuration data such as network rules, VPN setups, credentials, and certificates," data that,"[i]n the wrong hands, . . . provides valuable insight into internal networks and could help attackers plan targeted intrusions."[10]

78.    As the SonicWall cloud backup breach shows, SonicWall did not use reasonable security measures appropriate to the sensitive firewall data that it collected from customers like Marquis and stored in its cloud environment.

79.    Furthermore, SonicWall negligently failed to detect the cloud backup breach for

---

[10] *See, e.g.*, Sascha Hasse, *When Trust Becomes a Threat: The SonicWall Breach and the Case for Zero Trust Security*, Wire (Oct. 10, 2025), https://wire.com/en/blog/sonicwall-breach-zero-trust.

several months. SonicWall has represented publicly that it first detected suspicious activity related to the downloading of backup firewall configuration files stored in its cloud environment in early September 2025.[11]

80.    Even accounting for SonicWall's failure to identify and patch its vulnerability, Marquis could have prevented or mitigated the Data Breach by encrypting sensitive data at rest and in transit, enabling multi-factor authentication to verify the credentials of individuals attempting to access sensitive information, monitoring networks to detect unauthorized access from third party networks and the transfer of large volumes of data to outside networks. Had Marquis implemented these basic and industry standard measures, the threat actors that exploited the SonicWall vulnerability would not have been able to access intelligible data and/or would have been prevented from exfiltrating the data.

81.    Moreover, Marquis should have audited and verified the integrity of SonicWall's software to ensure that the product was adequate to protect the large volume of sensitive information it collected, used, and stored. Had Marquis performed regular software audits and penetration testing, it would have detected the exploited vulnerability and prevented the Data Breach.

82.    Defendants could have prevented this Data Breach by examining their cybersecurity protocols and ensuring vulnerabilities were identified and addressed and reasonable safeguards were continuously maintained, but failed to do so.

83.    Defendants' negligence in safeguarding Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts regarding the need to protect and

---

[11] *Cloud Backup Security Incident Investigation Complete and Strengthened Cyber Resilience*, SonicWall (Nov. 4, 2025), https://www.sonicwall.com/blog/cloud-backup-security-incident-investigation-complete-and-strengthened-cyber-resilience.

secure sensitive data.

84. As discussed below, Defendants disregarded the rights of Plaintiffs and Class Members by (a) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that their network servers were protected against unauthorized intrusions; (b) failing to disclose that they did not have adequately robust security protocols and training practices in place to safeguard Plaintiffs' and Class Members' Private Information; (c) failing to take standard and reasonably available steps to prevent the Data Breach; (d) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (e) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

### E. Defendants Knew of the Risk of a Cyberattack because Financial Services Companies in Possession of Private Information Are Particularly Susceptible.

85. Defendants' negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data, particularly financial data.

86. Private Information of the kind accessed in the Data Breach is of great value to cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the Internet black market known as the dark web.

87. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as his or her name, Social Security number, and financial records. This may be accomplished alone, or in combination with other personal or identifying information connected or linked to an individual such as his or her birthdate, birthplace, and mother's maiden name.

88. Data thieves regularly target entities that store Private Information like Defendant Marquis due to the highly sensitive information they maintain. Defendants knew and understood that Plaintiffs' and Class Members' Private Information is valuable and highly sought after by

20

criminal parties who seek to illegally monetize it through unauthorized access.

89.    Data breaches are on the rise. The increase in data breach attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industries, including Defendants themselves. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[12]

90.    In 2021, a record 1,862 data breaches occurred, resulting in approximately 293,927,708 sensitive records being exposed, a 68% increase from 2020.[13]

91.    In 2022, the Identity Theft Resource Center's Annual End-of-Year Data Breach Report listed 1,802 total compromises involving 422,143,312 victims for 2022, which was just 50 compromises short of the record set in 2021.[14]

92.    The number of data breach victims surpassed 1 billion for the first half of 2024, according to the Identity Theft Resource Center.[15]

93.    This trend has not slowed. The United States saw a new record of 3,322 data compromises in 2025, a massive 79 percent (79%) jump over five years.[16]

---

[12] IBM, *Cost of a data breach 2022: A million-dollar race to detect and respond*, https://www.ibm.com/reports/data-breach

[13] *See* 2021 Data Breach Annual Report, ITRC 6 (Jan. 2022), available at https://www.idtheftcenter.org/notified (last visited Mar. 4, 2026).

[14] *2022 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 25, 2023), available at:

https://www.idtheftcenter.org/publication/2022-data-breach-report/?utm_source=press+release&utm_medium=web&utm_campaign=2022+Data+Breach+Report (last visited Mar. 4, 2026).

[15] https://www.usatoday.com/story/money/2024/07/18/data-breach-what-to-do/74441060007/.

[16] *2025 End of Year Data Breach Report*, Identity Theft Resource Center (Jan. 2026), available at:

94.    This readily available and accessible information confirms that, prior to the Data Breach, Defendants knew or should have known that: (i) cybercriminals were targeting entities such as Defendants that stored large volumes of PII, (ii) cybercriminals were ferociously aggressive in their pursuit of companies in possession of significant sensitive information such as Defendants, (iii) cybercriminals were leaking corporate information on dark web portals, and (iv) cybercriminals' tactics included threatening to release stolen data.

95.    Also, in light of recent high profile data breaches at other industry leading companies, including T-Mobile, USA (37 million records, February-March 2023), 23andMe, Inc. (20 million records, October 2023), Wilton Reassurance Company (1.4 million records, June 2023), NCB Management Services, Inc. (1 million records, February 2023), Defendants knew or should have known that the Private Information that they collected and maintained would be targeted by cybercriminals.

96.    Despite the prevalence of public announcements of data breach and data security compromises, Defendants failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

97.    As software, data analytics, and advisory service providers to financial institutions in possession of financial institution consumers' highly sensitive Private Information, Defendants knew or should have known the importance of safeguarding the Private Information entrusted to them by Plaintiffs and Class Members.

98.    Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information in Defendants' custody and care would be targeted by hackers and

---

https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-Report.pdf (last visited Mar. 4, 2026).

22

cybercriminals for use in a variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

99.     Defendants likewise knew or should have known of the foreseeable consequences if their network systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendants failed to implement or follow reasonable cybersecurity measures to protect against the Data Breach.

## F.  Defendants Were Required, But Failed, to Comply with FTC Rules and Guidance.

100.     The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

101.     In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which establishes cyber-security guidelines for businesses like Defendants. These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

102.     The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

103.     The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex

passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

104. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendants must undertake to meet their data security obligations.

105. Such FTC enforcement actions include actions that fail to employ adequate data security practices like Defendants. *See, e.g.*, *In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

106. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duties in this regard.

107. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "[m]ost consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is

currency. The larger the data set, the greater potential for analysis and profit."[17]

108.    Defendants failed to properly implement basic data security practices, in violation of their duties under the FTC Act.

109.    Defendants' failures to employ reasonable and appropriate means to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by the FTC Act.

### G. Defendants Failed to Comply with Industry Standards and their Common Law Duty to Safeguard Plaintiffs' and the Class Members' Private Information.

110.    In addition to their obligations under federal and state laws, Defendants owed a common law duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

111.    Data breaches are preventable.[18] As Lucy Thompson wrote in the Data Breach and Encryption Handbook, "In almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[19] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[20]

112.    Defendants' duty owed to Plaintiffs and Class Members obligated them to provide

---

[17] *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), *available at* http://ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Feb. 26, 2026).

[18] Lucy L. Thomson, "Despite the Alarming Trends, Data Breaches Are Preventable," *in* DATA BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012), available at https://lawcat.berkeley.edu/record/394088.

[19] *Id.* at 17.

[20] *Id.* at 28.

reasonable data security, including consistency with industry standards and requirements, and to ensure that the servers, networks, and protocols storing Plaintiffs' and Class Members' Private Information adequately protected it.

113.    Defendants further owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their custody and control, including adequately supervising employees with access to Private Information.

114.    Defendants likewise owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

115.    A number of published industry and national best practices are widely used as a go-to resource when developing an institution's cybersecurity standards.

116.    The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security, Incident Response Management, and Penetration Testing.

117.    The U.S. Government's National Institute of Standards and Technology ("NIST")

26

also recommends certain practices to safeguard systems, such as the following:[21]

    a.   Control who logs on to your network and uses your computers and other devices.

    b.   Use security software to protect data.

    c.   Encrypt sensitive data, at rest and in transit.

    d.   Conduct regular backups of data.

    e.   Update security software regularly, automating those updates if possible.

    f.   Have formal policies for safely disposing of electronic files and old devices.

    g.   Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

118. Further still, United States Cybersecurity and Infrastructure Security Agency ("CISA") makes specific recommendations to organizations to guard against cybersecurity attacks, including:

    a.   reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication,"

    b.   "[e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA,"

    c.   "[c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and

    d.   "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events",

    e.   "[c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and

    f.   "[e]nsur[ing] that the organization is prepared to respond if an intrusion

---

[21] National Institute of Standards and Technology, *Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf

occurs," and other steps.[22]

119.    Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of one or more of the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

## H.  The Harms Caused by the Data Breach Now and Going Forward

120.    Defendants' failure to ensure adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately caused injuries to Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

121.    As a result of the Data Breach, the Private Information of Plaintiffs and Class Members has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class Members, or likely to be suffered as a direct result of Defendants' Data Breach, include: (a) theft of their Private Information; (b) costs associated with the detection and prevention of identity theft; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of this Breach; (d) the emotional distress, stress, nuisance, and annoyance of responding to, and resulting from, the Data

---

[22] *Shields Up: Guidance for Organizations*, CYBERSECURITY & INFRASTRUCTURE SEC. AG'Y, https://www.cisa.gov/shields-guidance-organizations (last visited March 19, 2026).

Breach; (e) the actual and/or imminent injury arising from actual and/or potential fraud and identity theft resulting from their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (f) damage to and diminution in value of their personal data entrusted to Defendants with the mutual understanding that Defendants would safeguard their Private Information against theft and not allow access to and misuse of their personal data by any unauthorized third party; and (g) the continued risk to their Private Information, which remains in the possession of Defendants, and which is subject to further injurious breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

      i.    ***The Data Breach Increases Plaintiffs' and Class Members' Risk of Identity Theft***

122.    The ramifications of Defendants' failures to keep secure the Private Information Plaintiffs and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future. Victims of data breaches are susceptible to becoming victims of identity theft. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 17 C.F.R. § 248.201(9). When "identity thieves have your personal information, they can drain your bank account, run up charges on your credit cards, open new utility accounts, or get medical treatment on your health insurance."[23]

---

[23] *Prevention and Preparedness*, New York State Police, https://troopers.ny.gov/prevention-and-preparedness (last visited Nov. 24, 2025).

123.     Plaintiffs and Class Members face a substantial risk of identity theft given that their Private Information was compromised in the Data Breach. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[6]

124.     The types of data that may have been accessed and compromised here can be used to perpetrate fraud and identity theft. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[24] This is precisely the kind of PII belonging to Plaintiffs' and the Class that was taken from Defendants' systems.

125.     Stolen Private Information is often trafficked on the "dark web," a heavily encrypted part of the Internet that is not accessible via traditional search engines. The dark web is an unindexed layer of the Internet that requires special software or authentication to access. Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.

126.     Law enforcement has difficulty policing the "dark web" due to this encryption, which allows users and criminals to conceal their identities and online activity.

127.     When malicious actors infiltrate companies and copy and exfiltrate the Private

---

[24] 17 C.F.R. § 248.201 (2013).

Information that those companies store, the stolen information often ends up on the dark web where malicious actors buy and sell that information for profit.[25] A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, PII like the Private Information at issue here.  The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the Internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.

128.    For example, when the U.S. Department of Justice announced their seizure of AlphaBay—the largest online "dark market"—in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity."[26] Marketplaces similar to the now-defunct AlphaBay continue to be "awash with [PII] belonging to victims from countries all over the world."[27]

129.    Private Information remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[28] Criminals can also purchase access to entire

---

[25] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Dec. 28, 2020) https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited Nov. 24, 2025).

[26] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://res.armor.com/resources/blog/stolen-pii-ramifications-identity-theft-fraud-dark-web/  (last visited Nov. 24, 2025).

[27] *Id.*

[28] *Id.*

company data breaches from $900 to $4,500.[29]

130.    Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to numerous serious fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[30]

131.    According to the Social Security Administration, each time an individual's Social Security number is compromised, "the potential for a thief to illegitimately gain access to bank accounts, credit cards, driving records, tax and employment histories and other private information increases."[31] Moreover, "[b]ecause many organizations still use SSNs as the primary identifier, exposure to identity theft and fraud remains."[32] In fact, "[a] stolen Social Security number is one of the leading causes of identity theft and can threaten your financial health."[33]

---

[29] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015) https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Nov. 24, 2025).

[30] Social Security Admin., Pub. No. 06-10064, *Identity Theft and Your Social Security Number* (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[31] *See* Social Security Admin., *Avoid Identity Theft: Protect Social Security Numbers*, https://www.ssa.gov/phila/ProtectingSSNs.htm (last visited Feb. 26, 2026).

[32] *Id.*

[33] *See How to Protect Yourself from Social Security Number Identity Theft*, EQUIFAX https://www.equifax.com/personal/education/identity-theft/articles/-/learn/social-security-number-identity-theft (last visited Feb. 26, 2026).

132.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.[34] Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[35]

133.    For these reasons, some courts have referred to Social Security numbers as the "gold standard" for identity theft. *Portier v. NEO Tech. Sols.*, No. 3:17-CV-30111, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant  .   .   .   Access to Social Security numbers causes long-lasting jeopardy because the Social Security Administration does not normally replace Social Security numbers."); *see also McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 272 (S.D.N.Y. Mar. 8, 2021) (noting that Social Security numbers are: arguably "the most dangerous type of personal information in the hands of identity thieves"; Unlike a credit card number, which can be changed to eliminate the risk of harm following a data breach, "[a] Social Security number derives its value in that it is immutable," and when stolen can "forever be wielded to identify [the victim] and target him in fraudulent schemes and identity theft attacks.").

134.    Victims of identity theft suffer from both direct and indirect financial losses.

---

[34] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Feb. 26, 2026).
[35] *Id.*

According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained. It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[36]

135.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

136.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

137.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.[37]

138.    Further complicating the issues faced by victims of identity theft, data thieves may

---

[36] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) https://bjs.ojp.gov/content/pub/pdf/vit18.pdf.
[37]    *2019 Internet Crime Report Released*, FBI (Feb. 11, 2020) https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120#:~:text=IC3%20received%20467%2C361%20complaints%20in,%2Ddelivery%20scams%2C%20and%20extortion (last visited Nov. 24, 2025).

wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant for years or even decades to come.

139. Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit from their misfortune.

140. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[38]

141. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

142. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In

---

[38] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, Social Security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Maria Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.eom/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

143. The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like contact information) of Plaintiffs and the other Class Members.

144. Thus, even if certain information (such as contact information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

145. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals.

146. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized actors can easily access and misuse Plaintiffs' and Class Members' Private Information due to the Data Breach.

147. Plaintiffs and Class Members are also at a continued risk because their Private Information remains on Defendants' server, which has already been shown to be susceptible to compromise and is subject to further attack so long as Defendants fail to undertake the necessary and appropriate security measures to protect consumers' Private Information in their care.

### ii. *Loss of Time to Mitigate the Risk of Identify Theft and Fraud*

148. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time

to repair the damage to their good name and credit record."[39]

149.    Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm. Plaintiffs and Class Members have spent time, and will spend additional time in the future, on a variety of prudent actions, such as placing freezes and alerts with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

150.    Plaintiffs' and Class Members' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[40]

### iii.    *Diminished Value of PII*

151.    PII is a valuable property right. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value. Indeed, on the black market, PII can sell for as much as $363 per record

---

[39] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. GOV'T ACCOUNTABILITY OFFICE, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Feb. 26, 2026) ("GAO Report").

[40] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf. (last visited Mar. 4, 2026).

according to the Infosec Institute.[41]

152.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[42] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[43] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[44]

153.    The fraudulent activity resulting from the Data Breach may not come to light for years.

154.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where it holds significant value for the threat actors.

### iv.    *Reasonable and Necessary Future Cost of Credit and Identity Theft Monitoring*

155.    Given the type of targeted attack in this case and sophisticated criminal activity, the type of Private Information, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for

---

[41] *Data Breaches: In the Healthcare Sector*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/insights/blog/data-breaches-in-the-healthcare-sector (last visited Jan. 13, 2025).

[42] David Lazarus, *Shadowy data brokers make the most of their invisibility cloak*, LA TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Feb. 26, 2026).

[43] DATACOUP, https://datacoup.com/ (last visited Feb. 26, 2026).

[44] *Frequently Asked Questions*, NIELSEN, available at: https://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money, filing false tax returns, taking out loans or lines of credit, or filing false unemployment claims.

156. Such fraud may go undetected until debt collection calls commence months or even years later. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

157. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts. The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers). Consequently, Plaintiffs and Class Members are at a substantially increased risk of fraud and identity theft for many years into the future, if not for the remainder of their lifetimes, necessitating Plaintiffs to undertake credit monitoring and identity theft monitoring to mitigate such risks.

158. To date, Defendants have done nothing to provide Plaintiffs and Class Members with relief for the damages they have suffered due to the Data Breach.

159. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from the Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

### v.   *Loss of Benefit of the Bargain*

160.   Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

161.   When agreeing to provide their Private Information, which was a condition precedent to obtain banking services from Defendant Marquis' Clients, and paying Defendants, directly or indirectly, for these products and services, Plaintiffs and Class Members as consumers understood and expected that they were, in part, paying a premium for services and data security to protect the Private Information they were required to provide.

162.   In fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than they reasonably expected to receive under the bargains struck with Defendants and Marquis' Clients.

### vi.   *Emotional Distress*

163.   In addition to a remedy for economic harm, Plaintiffs and Class Members maintain an interest in ensuring that their Private Information is secure, remains secure, and is not subject to further misappropriation and theft.

164.   The actual and adverse effects to Plaintiffs and Class Members, including the imminent, immediate, and continuing increased risk of harm for identity theft, identity fraud and/or medical fraud directly or proximately caused by Defendants' wrongful actions and/or inaction and the resulting Data Breach require Plaintiffs and Class Members to take affirmative acts to recover their peace of mind and personal security including, without limitation, purchasing credit reporting services, purchasing credit monitoring and/or Internet monitoring services, frequently obtaining, purchasing and reviewing credit reports, bank statements, and other similar information, instituting and/or removing credit freezes and/or closing or modifying financial

accounts, for which there is a financial and temporal cost. Plaintiffs and other Class Members have suffered, and will continue to suffer, such damages for the foreseeable future.

## I.   **Plaintiffs' Experiences**

### *Plaintiff Kristin Bowles*

165.   Plaintiff Kristin Bowles, a resident of Bakersfield, California, was a client of Valley Strong Credit Union and is a victim of this Data Breach.

166.   To obtain financial services from Valley Strong Credit Union, Plaintiff Bowles was required to provide her Private Information to Valley Strong Credit Union, including her name, date of birth, email address, address, phone number, Social Security number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to Valley Strong Credit Union.

167.   Plaintiff Bowles trusted that Valley Strong Credit Union and all vendors of Valley Strong Credit Union with whom Valley Strong Credit Union shared Plaintiff's Private Information would use reasonable measures to protect her Private Information in accordance with state and federal law.

168.   On or around December 11, 2025, Marquis sent Plaintiff Bowles a notice letter informing her that her Private Information, including her name, date of birth, and Social Security number, was compromised because of the Data Breach.

169.   Defendants deprived Plaintiff Bowles of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Breach.

170.   As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Bowles's Private Information to cybercriminals who have already used that information for nefarious purposes.

171.    Indeed, on December 19, 2025, an unknown third party accessed Plaintiff Bowles's account with Valley Strong Credit Union using her Private Information and incurred an unauthorized charge in the amount of $36.00 on her Valley Strong Credit Union credit card. Plaintiff Bowles was forced to cancel her credit card and contact the bank to return her funds. Plaintiff Bowles attributes the unauthorized transaction to the Data Breach based on the temporal proximity, her careful handling of her Private Information, and the fact that the unauthorized transaction is atypical and unprecedented in her experience.

172.    As a result of the Data Breach, Plaintiff Bowles suffered actual injury in the form of damage to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

173.    As a result of the Data Breach, Plaintiff Bowles has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; contacting Valley Strong Credit Union regarding the fraudulent activity on her credit card; obtaining a new credit card; and monitoring her accounts for additional suspicious activity. In sum, Plaintiff Bowles has spent time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

174.    As a result of the Data Breach, Plaintiff Bowles fears for her personal financial security and uncertainty over exactly what information was revealed in the Data Breach. She is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of her privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

175.    Plaintiff Bowles is now subject to a substantially increased imminent risk of fraud,

42

identity theft, and misuse for the remainder of her lifetime resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Bowles about the Data Breach in a timely fashion.

176.     Plaintiff Bowles has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff James Dull*

177.     Plaintiff James Dull, a resident of Chiefland, Florida, was a client of Capital City Bank and is a victim of this Data Breach.

178.     To obtain financial services from Capital City Bank, Plaintiff Dull was required to provide his Private Information to Capital City Bank, including his name, date of birth, address, email address, phone number, Social Security number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to Capital City Bank.

179.     Plaintiff Dull trusted that Capital City Bank and all vendors of Capital City Bank with whom Capital City Bank shared Plaintiff's Private Information would use reasonable measures to protect his Private Information in accordance with state and federal law.

180.     On or around November 26, 2025, Marquis sent Plaintiff Dull a notice letter informing him that his Private Information, including his credit and debit card number, date of birth, and Social Security number, was compromised because of the Data Breach.

181.     Defendants deprived Plaintiff Dull of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

182.     As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Dull's

Private Information to cybercriminals who have already used that information for nefarious purposes.

183.    Indeed, since the Data Breach, Plaintiff Dull has experienced an increase in spam phone calls, amounting to approximately 15 to 20 spam phone calls per week. Plaintiff Dull receives these spam phone calls on the same phone number he provided to Capital City Bank in the course of receiving financial services from Capital City Bank. Plaintiff Dull attributes these spam calls to the Data Breach based on the temporal proximity, his careful handling of his phone number, and the fact that the spam calls were atypical and unprecedented in his experience.

184.    As a result of the Data Breach, Plaintiff Dull suffered actual injury in the form of damage to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

185.    As a result of the Data Breach, Plaintiff Dull has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; contacting Capital City Bank to review and confirm his account activity; investigating the pre-approval letters from Capital One Bank; filtering spam calls; and monitoring his accounts for additional suspicious activity. In sum, Plaintiff Dull has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

186.    As a result of the Data Breach, Plaintiff Dull fears for his personal financial security and uncertainty over exactly what information was revealed in the Data Breach. He is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

187.     Plaintiff Dull is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Dull about the Data Breach in a timely fashion.

188.     Plaintiff Dull has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Marlene Ehler*

189.     Plaintiff Marlene Ehler, a resident of Appleton, Maine, was a client of Maine State Credit Union and is a victim of this Data Breach.

190.     To obtain financial services from Maine State Credit Union in the form of a car loan, Plaintiff Ehler was required to provide her Private Information to Maine State Credit Union, including her name, date of birth, email address, address, phone number, Social Security number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to Maine State Credit Union.

191.     Plaintiff Ehler trusted that Maine State Credit Union and all vendors of Maine State Credit Union with whom Maine State Credit Union shared Plaintiff's Private Information would use reasonable measures to protect her Private Information in accordance with state and federal law.

192.     On or around November 26, 2025, Marquis sent Plaintiff Ehler a notice letter informing her that her Private Information, including her date of birth and Social Security number, was compromised because of the Data Breach.

193.     Defendants deprived Plaintiff Ehler of the earliest opportunity to guard herself

against the Data Breach's effects by failing to promptly notify her about the Breach.

194.    As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Ehler's Private Information to cybercriminals who have already used that information for nefarious purposes.

195.    Indeed, after the Data Breach, an unknown third party applied for a home loan in Plaintiff Ehler's name, using Plaintiff Ehler's Private Information, without Plaintiff Ehler's authorization. Plaintiff Ehler noticed the home loan application on her credit report and took steps to freeze her credit. Plaintiff Ehler attributes this fraud activity to the Data Breach based on the temporal proximity, her careful handling of her Private Information, and the fact that the fraud activity is atypical and unprecedented in her experience.

196.    As a result of the Data Breach, Plaintiff Ehler suffered actual injury in the form of damage to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

197.    As a result of the Data Breach, Plaintiff Ehler has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; contacting Maine State Credit Union regarding the Data Breach; mitigating the damage done to her credit report from the fraudulent home loan application; contacting credit bureaus to freeze her credit; and monitoring her accounts for additional suspicious activity. In sum, Plaintiff Ehler has spent time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

198.    As a result of the Data Breach, Plaintiff Ehler fears for her personal financial security and uncertainty over exactly what information was revealed in the Data Breach. She is

46

experiencing anxiety, distress, and fear because of the Data Breach and the invasion of her privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

199.    Plaintiff Ehler is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of her lifetime resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Ehler about the Data Breach in a timely fashion.

200.    Plaintiff Ehler has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff John Hamisch*

201.    Plaintiff John Hamisch, a resident of Bakersfield, California, was a client of Valley Strong Credit Union and is a victim of this Data Breach.

202.    To obtain financial services from Valley Strong Credit Union, Plaintiff Hamisch was required to provide his Private Information to Valley Strong Credit Union, including his name, date of birth, address, phone number, email address, Social Security number, drivers' license information, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to Valley Strong Credit Union.

203.    Plaintiff Hamisch trusted that Valley Strong Credit Union and all vendors of Valley Strong Credit Union with whom Valley Strong Credit Union shared Plaintiff's Private Information would use reasonable measures to protect his Private Information in accordance with state and federal law.

47

204. Marquis sent Plaintiff Hamisch a notice letter informing him that his Private Information was compromised because of the Data Breach.

205. Defendants deprived Plaintiff Hamisch of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

206. As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Hamisch's Private Information to cybercriminals who have already used that information for nefarious purposes.

207. Indeed, since the Data Breach, Plaintiff Hamisch has experienced an increase in spam and phishing phone calls and emails. Plaintiff Hamisch receives these spam phone calls on the same phone number and email address he provided to Valley Strong Credit Union in the course of receiving financial services from Valley Strong Credit Union. Plaintiff Hamisch attributes these spam calls and emails to the Data Breach based on the temporal proximity, his careful handling of his phone number, and the fact that the spam calls were atypical and unprecedented in his experience.

208. In addition, since the Data Breach, Plaintiff Hamisch has received notices from Valley Strong Credit Union alerting him of attempted unauthorized activity within his bank account.

209. As a result of the Data Breach, Plaintiff Hamisch suffered actual injury in the form of damage to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

210. As a result of the Data Breach, Plaintiff Hamisch has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: contacting Valley Strong Credit Union to review and confirm his account activity;

investigating and halting the unauthorized activity within his Valley Strong Credit Union account; and continuing to monitor his account for additional suspicious activity. In sum, Plaintiff Hamisch has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

211.    As a result of the Data Breach, Plaintiff Hamisch fears for his personal financial security and uncertainty over exactly what information was revealed in the Data Breach. He is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

212.    Plaintiff Hamisch is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Hamisch about the Data Breach in a timely fashion.

213.    Plaintiff Hamisch has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Robert Harris*

214.    Plaintiff Robert Harris, a resident of Fryeburg, Maine, was a client of Norway Savings Bank and is a victim of this Data Breach.

215.    To obtain financial services from Norway Savings Bank, Plaintiff Harris was required to provide his Private Information to Norway Savings Bank, including his name, date of birth, address, phone number, Social Security number, and financial information, which Marquis

subsequently obtained in the course of rendering digital and physical marketing and communication services to Norway Savings Bank.

216. Plaintiff Harris trusted that Norway Savings Bank and all vendors of Norway Savings Bank with whom Norway Savings Bank shared Plaintiff's Private Information would use reasonable measures to protect his Private Information in accordance with state and federal law.

217. Marquis sent Plaintiff Harris a notice letter informing him that his Private Information was compromised because of the Data Breach.

218. Defendants deprived Plaintiff Harris of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

219. As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Harris's Private Information to cybercriminals who have already used that information for nefarious purposes.

220. Indeed, since September of 2025, Plaintiff Harris has experienced unauthorized and fraudulent charges on his Norway Savings Bank debit card at least twice. Each time, Plaintiff Harris was forced to cancel his card and obtain a new one

221. Specifically, Plaintiff Harris was charged $30 because of an automatic payment attempt on an account that failed. Plaintiff Harris had to cancel the debit card the automatic payment was associated with and obtain a new one due to the unauthorized and fraudulent charge, but was unable to reassign the automatic payment before the automatic payment attempted to charge. Plaintiff Harris has not been reimbursed for this out-of-pocket expense.

222. In addition, Plaintiff Harris has suffered from an increase in spam phone calls and emails. Plaintiff Harris receives these spam phone calls on the same phone number and email address he provided to Norway Savings Bank in the course of receiving financial services from

50

Norway Savings Bank.

223.    Plaintiff Harris attributes these spam calls and unauthorized charge to the Data Breach based on the temporal proximity, his careful handling of his Private Information, and the fact that these fraudulent activities were atypical and unprecedented in his experience.

224.    As a result of the Data Breach, Plaintiff Harris suffered actual injury in the form of damage to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

225.    As a result of the Data Breach, Plaintiff Harris has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; contacting Marquis to find out more information about the Data Breach; contacting Norway Savings Bank regarding the unauthorized activity on his debit card; and monitoring his accounts for additional suspicious activity. In sum, Plaintiff Harris has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

226.    As a result of the Data Breach, Plaintiff Harris fears for his personal financial security and uncertainty over exactly what information was revealed in the Data Breach. He is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

227.    Plaintiff Harris is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's

51

failure to inform Plaintiff Harris about the Data Breach in a timely fashion.

228.    Plaintiff Harris has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Edward Hellyer

229.    Plaintiff Edward Hellyer, a resident of Crystal River, Florida, was a client of Suncoast Credit Union and is a victim of this Data Breach.

230.    To obtain financial services from Suncoast Credit Union, Plaintiff Hellyer was required to provide his Private Information to Suncoast Credit Union, including his name, Social Security number, date of birth, address, email address, phone number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to Suncoast Credit Union.

231.    Plaintiff Hellyer trusted that Suncoast Credit Union and all vendors of Suncoast Credit Union with whom Suncoast Credit Union shared Plaintiff's Private Information would use reasonable measures to protect his Private Information in accordance with state and federal law.

232.    On or around January 2, 2026, Marquis sent Plaintiff Hellyer a notice letter informing him that his Private Information, including his name and Social Security number were compromised because of the Data Breach.

233.    Defendants deprived Plaintiff Hellyer of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

234.    As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Hellyer's Private Information to cybercriminals who have already used that information for nefarious purposes.

52

235. Indeed, since the Data Breach, Plaintiff Hellyer has suffered from a dramatic increase in spam emails on the same email address that he previously provided to Suncoast Credit Union in order to receive services. He has received over 120 phishing scams since February 1, 2026.

236. Additionally, on or about January 30, 2026, as a direct result of the Data Breach, an unknown third party used Plaintiff's Private Information and attempted to make an unauthorized charge on Plaintiff Hellyer's Suncoast Credit Union debit card.

237. Plaintiff Hellyer attributes these phishing scams and attempted unauthorized transaction to the Data Breach based on the temporal proximity, his careful handling of his Private Information, and the fact that these fraudulent activities are atypical and unprecedented in his experience.

238. As a result of the Data Breach, Plaintiff Hellyer suffered actual injury in the form of damage to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

239. As a result of the Data Breach, Plaintiff Hellyer has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; investigating the fraud on his debit card; contacting Suncoast Credit Union both about the Data Breach and to dispute unauthorized charges on his debit card; and monitoring his accounts for additional suspicious activity. In sum, Plaintiff Hellyer has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

240. As a result of the Data Breach, Plaintiff Hellyer fears for his personal financial

security and uncertainty over exactly what information was revealed in the Data Breach. He is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

241.    Plaintiff Hellyer is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Hellyer about the Data Breach in a timely fashion.

242.    Plaintiff Hellyer has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Kathleen Matlock

243.    Plaintiff Kathleen Matlock, a resident of Lindale, Texas, was a client of First National Bank of Pennsylvania and is a victim of this Data Breach.

244.    To obtain financial services from First National Bank of Pennsylvania, Plaintiff Matlock was required to provide her Private Information to First National Bank of Pennsylvania, including her name, Social Security number, date of birth, address, email address, phone number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to First National Bank of Pennsylvania.

245.    Plaintiff Matlock trusted that First National Bank of Pennsylvania and all vendors of First National Bank of Pennsylvania with whom First National Bank of Pennsylvania shared Plaintiff's Private Information would use reasonable measures to protect her Private Information in accordance with state and federal law.

54

246. On or around November 25, 2025, Marquis sent Plaintiff Matlock a notice letter informing her that her Private Information, including her name, date of birth, and Social Security number, was compromised because of the Data Breach.

247. Defendants deprived Plaintiff Matlock of the earliest opportunity to guard herself against the Data Breach's effects by failing to promptly notify her about the Breach.

248. As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Matlock's Private Information to cybercriminals who have already used that information for nefarious purposes.

249. Indeed, since the Data Breach, Plaintiff Matlock has suffered from a dramatic increase in spam emails on the same email address that she previously provided to First National Bank of Pennsylvania in order to receive services. Plaintiff Matlock attributes these spam emails to the Data Breach based on the temporal proximity, her careful handling of her phone number, and the fact that the spam emails were atypical and unprecedented in her experience.

250. As a result of the Data Breach, Plaintiff Matlock suffered actual injury in the form of damage to and diminution in the value of her Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

251. As a result of the Data Breach, Plaintiff Matlock has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; filtering through spam emails; and monitoring her accounts for additional suspicious activity. In sum, Plaintiff Matlock has spent time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

252. As a result of the Data Breach, Plaintiff Matlock fears for her personal financial

55

security and uncertainty over exactly what information was revealed in the Data Breach. She is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of her privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

253.    Plaintiff Matlock is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of her lifetime resulting from her Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Matlock about the Data Breach in a timely fashion.

254.    Plaintiff Matlock has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Stanley Piszczor*

255.    Plaintiff Stanley Piszczor, a resident of Antigo, Wisconsin, was a client of CoVantage Credit Union and, upon information and belief, is a victim of this Data Breach.

256.    To obtain financial services from CoVantage Credit Union, Plaintiff Piszczor was required to provide his Private Information to CoVantage Credit Union, including his name, date of birth, address, phone number, Social Security number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to CoVantage Credit Union.

257.    Plaintiff Piszczor trusted that CoVantage Credit Union and all vendors of CoVantage Credit Union with whom CoVantage Credit Union shared Plaintiff's Private Information would use reasonable measures to protect his Private Information in accordance with state and federal law.

258. Marquis sent Plaintiff Piszczor a notice letter informing him that his Private Information was compromised because of the Data Breach.

259. Defendants deprived Plaintiff Piszczor of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

260. As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Piszczor's Private Information to cybercriminals who have already used that information for nefarious purposes.

261. Indeed, since approximately October 2025, Plaintiff Piszczor has experienced unauthorized and fraudulent charges on his CoVantage Credit Union credit card approximately five times. Each time, Plaintiff Piszczor has been forced to cancel his card and obtain a new one. Each time, he has driven to the credit union branch in order to cancel his card and has incurred gas costs. Plaintiff Piszczor's credit score dropped following these fraudulent charges. Plaintiff Piszczor attributes these unauthorized transactions to the Data Breach based on the temporal proximity, his careful handling of his Private Information, and the fact that the unauthorized transactions were atypical and unprecedented in his experience.

262. In addition, Plaintiff Piszczor has suffered from an increase in spam phone calls and emails. Plaintiff Piszczor receives these spam phone calls on the same phone number and email address he provided to CoVantage Credit Union in the course of receiving financial services from CoVantage Credit Union.

263. As a result of the Data Breach, Plaintiff Piszczor suffered actual injury in the form of damage to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

264. As a result of the Data Breach, Plaintiff Piszczor has spent time and made

57

reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: contacting Marquis to find out more information about the Data Breach; investigating the unauthorized activity on his credit card and working with CoVantage Credit Union to resolve those issues; filtering through spam phone calls and emails; and monitoring his accounts for additional suspicious activity. In sum, Plaintiff Piszczor has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

265.    As a result of the Data Breach, Plaintiff Piszczor fears for his personal financial security and uncertainty over exactly what information was revealed in the Data Breach. He is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

266.    Plaintiff Piszczor is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Piszczor about the Data Breach in a timely fashion.

267.    Plaintiff Piszczor has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### *Plaintiff Joseph Ridout*

268.    Plaintiff Joseph Ridout, a resident of San Rafael, California, was a client of BluPeak Credit Union and is a victim of this Data Breach.

269.    To obtain financial services from BluPeak Credit Union, Plaintiff Ridout was

required to provide his Private Information to BluPeak Credit Union, including his name, Social Security number, date of birth, address, email address, phone number, and financial information, which Marquis subsequently obtained in the course of rendering digital and physical marketing and communication services to BluPeak Credit Union.

270. Plaintiff Ridout trusted that BluPeak Credit Union and all vendors of BluPeak Credit Union with whom BluPeak Credit Union shared Plaintiff's Private Information would use reasonable measures to protect his Private Information in accordance with state and federal law.

271. On or around December 5, 2025, Marquis sent Plaintiff Ridout a notice letter informing him that his Private Information, including his Social Security number, was compromised because of the Data Breach.

272. Defendants deprived Plaintiff Ridout of the earliest opportunity to guard himself against the Data Breach's effects by failing to promptly notify him about the Breach.

273. As a result of its inadequate cybersecurity, Defendants exposed Plaintiff Ridout's Private Information to cybercriminals who have already used that information for nefarious purposes.

274. Indeed, since the Data Breach, Plaintiff Ridout has suffered from a dramatic increase in spam emails on the same email address that he previously provided to BluPeak Credit Union in order to receive services. Plaintiff Ridout attributes these spam emails to the Data Breach based on the temporal proximity, his careful handling of his Private Information, and the fact that the spam emails were atypical and unprecedented in his experience.

275. As a result of the Data Breach, Plaintiff Ridout suffered actual injury in the form of damage to and diminution in the value of his Private Information. After all, Private Information is a form of intangible property—property that Defendants were required to adequately protect.

59

276.     As a result of the Data Breach, Plaintiff Ridout has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to time spent: researching the Data Breach; filtering through spam emails; and monitoring his accounts for additional suspicious activity. In sum, Plaintiff Ridout has spent time dealing with the Data Breach, valuable time he otherwise would have spent on other activities, including work and/or recreation. This time has been lost forever and cannot be recaptured.

277.     As a result of the Data Breach, Plaintiff Ridout fears for his personal financial security and uncertainty over exactly what information was revealed in the Data Breach. He is experiencing anxiety, distress, and fear because of the Data Breach and the invasion of his privacy. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

278.     Plaintiff Ridout is now subject to a substantially increased imminent risk of fraud, identity theft, and misuse for the remainder of his lifetime resulting from his Private Information being placed in the hands of unauthorized third parties. This injury was worsened by Defendant's failure to inform Plaintiff Ridout about the Data Breach in a timely fashion.

279.     Plaintiff Ridout has a continuing interest in ensuring that his Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

280.     Pursuant to Federal Rule of Civil Procedure 23, Plaintiffs bring this nationwide class action individually and on behalf of all others similarly situated and seek certification of the following Classes:

> **Nationwide Class:** All persons in the United States whose Private Information was impacted by the Data Breach announced by

Defendants, including all individuals who received a Notice Letter from Marquis or a Client of Marquis ("Class"); and

**California Subclass:** All persons in the state of California whose Private Information was impacted by the Data Breach announced by Defendants, including all individuals who received a Notice Letter from Marquis or a Client of Marquis ("California Subclass").

281. Specifically excluded from the Classes are Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, principals, servants, partners, joint venturers, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

282. Plaintiffs reserve the right to amend the Class definitions above or add a subclass if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

283. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

284. Numerosity: The Classes are so numerous that joinder of all Class Members is impracticable. Although the precise number of such persons is unknown, and the facts are presently within the sole knowledge of Defendants, upon information and belief, Plaintiffs estimate that the Class is comprised of hundreds of thousands of Class Members, if not more. The Class is sufficiently numerous to warrant certification.

285. Typicality of Claims: Plaintiffs' claims are typical of those of other Class Members because Plaintiffs, like the unnamed Class, had their Private Information compromised as a result of the Data Breach. Plaintiffs are members of the Class, and their claims are typical of the claims of the members of the Class. The harms suffered by Plaintiffs are similar to that suffered by all

other Class Members which was caused by the same misconduct by Defendants.

286.    Adequacy of Representation: Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

287.    Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class action treatment will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Furthermore, because the monetary damages suffered by individual Class Members are relatively modest, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If class treatment of these claims is not available, Defendants will likely continue their wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for the wrongdoing as asserted herein.

288.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendants would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the

cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

289.    <u>Predominant Common Questions</u>: The claims of all Class Members present common questions of law or fact, which predominate over any questions affecting only individual Class Members, including the following:

    a.  Whether and to what extent Defendants had a duty to protect and safeguard the Private Information of Plaintiffs and Class Members;

    b.  Whether Defendants had a duty not to disclose the Private Information of Plaintiffs and Class Members to unauthorized third parties;

    c.  Whether Defendants failed to adequately safeguard the Private Information of Plaintiffs and Class Members;

    d.  Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

    e.  Whether Defendants' storage of Plaintiffs' and Class Members' Private Information was done in a negligent manner;

    f.  When Defendants actually learned of the Data Breach;

    g.  Whether Defendants failed to timely notify Plaintiffs and Class Members of the Breach;

    h.  Whether Defendants adequately and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

    i.  Whether Defendants' conduct violated the statutes as set forth herein;

    j.  Whether Defendants were unjustly enriched; and

    k.  The nature of relief, including damages and equitable relief, to which Plaintiffs

and Class Members are entitled.

290.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action. Defendants' uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

291.    Adequate notice can be given to Class Members directly using information maintained in Defendants' records.

292.    Policies Generally Applicable to the Class. Information concerning Defendants' policies is available from Defendants' records. This class action is also appropriate for certification because Defendants acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly and Plaintiffs' challenge of these policies hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiffs.

293.    The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct for Defendants. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

294.    Given that Defendants had not indicated any changes to their conduct or security measures, monetary damages are insufficient and there is no complete and adequate remedy at

law.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
**(On Behalf of Plaintiffs and the Class against all Defendants)**

295.    Plaintiffs incorporate the allegations in Paragraphs 1 through 279 above as if fully set forth herein.

296.    Plaintiffs bring this claim individually and on behalf of the Class Members.

297.    As a condition precedent to receiving financial services by Marquis' Clients, Plaintiffs and the Class were required to submit, directly or indirectly, personal, confidential Private Information to Defendants as a condition of receiving necessary banking and financial services.

298.    Plaintiffs and Class Members provided their Private Information to Marquis' Clients, which in turn provided that Private Information to Defendant Marquis, who took custody and care of Plaintiffs' and the Class Members' Private Information in the course of their business.

299.    When Defendant Marquis collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, they had full knowledge of the sensitivity of the Private Information to which they were entrusted, and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons.

300.    By taking custody of Plaintiffs' and Class Members' Private Information, Defendant Marquis accordingly undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

301.    Similarly, Defendant SonicWall had duties to exercise reasonable care in the

65

provision of its firewall products and services, including its firewall cloud backup product(s) and services, and to protect against the foreseeable risk of harm if its firewall cloud backup product(s) and services were compromised.

302.    Defendants were in a position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach, while Plaintiffs and Class Members had no ability to protect their Private Information once in Defendants' possession.

303.    Defendants owed a duty to Plaintiffs and Class Members to provide data security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other legal and regulatory requirements, to ensure that their systems and servers and the people and entities with access to them adequately protected Plaintiffs' and Class Members' Private Information.

304.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

305.    Plaintiffs and Class Members are within the class of persons the FTC Act intended to protect.

306.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

307.    Defendants likewise had a duty to have processes and procedures in place

66

sufficient to timely detect if their network was breached or if Plaintiffs' and Class Members' Private Information was exposed to unauthorized actors. However, Defendant Marquis and its Clients did not begin sending notice letters of the Breach until approximately December 2025—nearly four months after Defendant Marquis learned of the Breach.

308.    Defendants had, and continue to have, a duty to timely disclose that Plaintiffs' and Class Members' Private Information within its possession was compromised and precisely the types of information that were compromised.

309.    Defendants breached these duties in the following ways:

a.    Defendants breached their duties under Section 5 of the FTC Act by failing to use reasonable measures to safeguard and protect Plaintiffs' and Class Members' Private Information.

b.    Defendants breached their duties under Section 5 of the FTC Act by failing to have adequate data security practices to safeguard Plaintiffs' and Class Members' Private Information.

c.    Defendants breached the duties set forth in 15 U.S.C. § 45, and FTC Guidelines, by, among other things, failing to protect the Private Information it keeps; failing to properly dispose of personal information that was no longer needed; failing to encrypt information stored on computer networks; lacking the requisite understanding of their networks' vulnerabilities; and failing to implement policies to correct security issues.

310.    Defendants' failures to comply with the FTC Act is negligence *per se*.

311.    Defendants' duties to use reasonable care in protecting Plaintiffs' and Class Members' Private Information arose not only as a result of the statutes and regulations described

above, but also because Defendants are bound by industry standards to protect and secure such Private Information. The negligent acts and omissions committed by Defendants include, but are not limited to, the following:

    a. Failing to adopt, implement, and maintain adequate security measures consistent with Industry Standards to safeguard Plaintiffs' and Class Members' Private Information and guard against unauthorized access to such Private Information;

    b. Failing to adequately monitor the security of their networks and systems;

    c. Failing to properly vet and audit any vendors and service providers, including SonicWall, to ensure that they had adequate safeguards in place to protect the security and confidentiality of Plaintiffs' and Class Members' PII; and

    d. Failing to have plans in place to maintain reasonable data security safeguards, and to periodically and adequately test the security of its computer systems and network.

312. As the Data Breach and its timeline evidences, Marquis breached its duty of care by failing to take reasonable precautions and use reasonable security measures to keep secure the sensitive PII it collected from its Clients, such as encrypting the information; deleting the data from the server when it was no longer needed; revoking employee user accounts' access to servers storing PII when such access was no longer needed; restricting access to the servers storing PII to only employees that are necessary and adequately trained to prevent unauthorized use of their login credentials; training employees about cybersecurity and attempts to gain unauthorized access; investigating and addressing vulnerabilities in its data security practices; and/or implementing the necessary safeguards to identify malicious activity. These failures allowed and

caused cybercriminals to target Marquis' systems and carry out the Data Breach.

313.    Furthermore, SonicWall breached its duties and obligations by failing in one or more of the following ways: (a) to effectively secure the firewall cloud backup product issued to Marquis which it knew or reasonably should have known that Marquis used for data security using reasonable and adequate security procedures free of vulnerabilities and incidents; (b) to timely warn Marquis of the vulnerabilities in its firewall cloud backup product(s); (c) to properly monitor its network for unauthorized access by threat actors; (d) to prohibit unauthorized access to its network; (e) to take the proper and necessary precautions in monitoring its network to prevent unauthorized intrusions; (f) to properly train and/or supervise its employees, contractors, subcontractors, and/or agents responsible for code implementation and monitoring of its network; (g) to recognize or detect that the portion of its network containing its firewall cloud backup product(s) (and containing backups of Marquis' firewall configuration) had been compromised in a timely manner to mitigate the harm; (h) to utilize widely available software able to detect and prevent this type of attack; and (i) to timely notify Marquis that the portion of its network containing backups of Marquis' firewall configuration had been compromised. Defendant SonicWall's conduct amounts to at least negligence and violates federal and state statutes.

314.    Specifically, the vulnerability in SonicWall's firewall cloud backup service was a result of a code change that SonicWall made to its application programming interface ("API") that created a vulnerability exploitable by threat actors. This vulnerability allowed anyone with a device serial number, which can be generated by algorithm and are generally predictable, to download SonicWall's customers' configuration backups without using any SonicWall credentials. Furthermore, SonicWall had stored its customers' MFA scratch codes within the configuration backup files without encrypting them.

69

315.    As a cybersecurity company whose business purpose was to protect its customers networks, including by selling and servicing firewalls, SonicWall had reason to know that using predictable device serial numbers created a foreseeable vulnerability that threat actors could— and did—easily exploit. SonicWall's reckless use of easy-to-predict, easy-to-brute-force serial numbers constitutes an egregious failure to implement reasonable and appropriate security measures to prevent unauthorized disclosure of its customers' protected data that created an unreasonable and imminent risk of exposure of its clients, including Marquis' customer data protected by its firewall product, and its acts constituted a reckless indifference to this risk.

316.    In addition, SonicWall had reason to know that backing up its customers' MFA scratch codes without encrypting them left its customers vulnerable to cybertheft. As SonicWall knew or should have known, MFA scratch codes within the stolen configurations could be used to bypass MFA requirements in customer firewalls. MFA scratch codes are one-time-use codes to bypass MFA in the event of an emergency where the user may not be able to access their dual-factor authentication device or application. Exposure of MFA scratch codes poses a clear and substantial risk to a company using MFA in conjunction with its SonicWall firewall. SonicWall's failure to encrypt the scratch codes is an egregious departure from the normal standard of care expected of a company in SonicWall's position. SonicWall's failure to encrypt the MFA scratch codes created an unreasonable and imminent risk of exposure of its clients, including Marquis' customer data protected by its firewall product, and its acts constituted a reckless indifference to this risk.

317.    The configuration backups that the SonicWall breach compromised contained numerous pieces of sensitive data that could be leveraged to facilitate an attack against SonicWall users. SonicWall has admitted publicly and privately that the information could include

70

unencrypted MFA scratch codes, unencrypted usernames, SSL certificate information, local firewall and linked customer domain encrypted username passwords, firewall rules, and overall configuration information. As one industry source reported, the backups that SonicWall exposed "contained sensitive configuration data such as network rules, VPN setups, credentials, and certificates," data that,"[i]n the wrong hands, . . . provides valuable insight into internal networks and could help attackers plan targeted intrusions."[45]

318.    As the SonicWall cloud backup breach shows, SonicWall did not use reasonable security measures appropriate to the sensitive firewall data that it collected from customers like Marquis and stored in its cloud environment.

319.    Furthermore, SonicWall negligently failed to detect the cloud backup breach for several months. SonicWall has represented publicly that it first detected suspicious activity related to the downloading of backup firewall configuration files stored in its cloud environment in early September 2025.[46]

320.    Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class Members by failing to exercise reasonable care in protecting and safeguarding Plaintiffs' and Class Members' Private Information within Defendants' possession.

321.    Defendants, through their actions and/or omissions, unlawfully breached their duties to Plaintiffs and Class Members by failing to have appropriate procedures in place to detect and prevent dissemination of Plaintiffs' and Class Members' Private Information.

322.    Likewise, Defendants, through their actions and/or omissions, unlawfully

---

[45] *See, e.g.*, Sascha Hasse, *When Trust Becomes a Threat: The SonicWall Breach and the Case for Zero Trust Security*, Wire (Oct. 10, 2025), https://wire.com/en/blog/sonicwall-breach-zero-trust.
[46] *Cloud Backup Security Incident Investigation Complete and Strengthened Cyber Resilience*, SonicWall (Nov. 4, 2025), https://www.sonicwall.com/blog/cloud-backup-security-incident-investigation-complete-and-strengthened-cyber-resilience.

breached their duty to timely disclose to Plaintiffs and Class Members that the Private Information within Defendants' possession might have been compromised and precisely the type of information compromised.

323. Had Defendants implemented data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced as the Data Breach could have been detected earlier, the amount of Private Information compromised could have been greatly reduced.

324. But for Defendants' negligent conduct and each breach of the duties enumerated above, Plaintiffs' and Class Members' PII would not have been compromised, the Data Breach would not have occurred, or if the Data Breach had occurred, the harms therefrom would have been substantially mitigated.

325. It was foreseeable that SonicWall's failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

326. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

327. Defendants' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

328. Defendants' violations of the FTC Act as described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

329. As a result of Defendants' failure to timely notify Plaintiffs and Class Members that their Private Information had been compromised, Plaintiffs and Class Members were unable

72

to take the necessary precautions to mitigate damages by preventing future fraud.

330.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) lost or diminished value of their Private Information; (b) actual identity theft and fraud; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to uncompensated lost time; (d) loss of benefit of their bargain; and (e) the continued and certainly increased risk to their Private Information, which remains in Defendants' possession and subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it.

331.    As a further result of Defendants' negligence and breach of duties, Plaintiffs and Class Members remain in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

332.    As an additional direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, and other economic and non-economic losses.

73

## COUNT II
## NEGLIGENT SELECTION/HIRING/RETENTION
### (On Behalf of Plaintiffs and the Class against Defendant Marquis)

333. Plaintiffs incorporate the allegations in Paragraphs 1 through 279 above as if fully set forth herein.

334. Plaintiffs bring this claim individually and on behalf of the Class Members.

335. Texas recognizes a cause of action for negligently hiring an independent contractor.

336. Plaintiffs and Class Members provided their Private Information to Marquis' Clients, which in turn provided that Private Information to Defendant Marquis, who took custody and care of Plaintiffs' and the Class Members' Private Information in the course of its business.

337. When Marquis collected, came into possession of, and maintained Plaintiffs' and Class Members' Private Information, it had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons.

338. By taking custody of Plaintiffs' and Class Members' Private Information, Marquis accordingly undertook a duty to exercise reasonable care in safeguarding, securing, and protecting such information from being compromised, lost, stolen, misused, and/or disclosed to unauthorized parties.

339. Defendant Marquis was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a data breach, while Plaintiffs and Class Members had no ability to protect their Private Information once in Defendant's possession.

340. Marquis accordingly owed a duty to Plaintiffs and Class Members to provide data

security consistent with industry standards, applicable standards of care from statutory authority like Section 5 of the FTC Act, and other legal and regulatory requirements, to ensure that their systems and servers and the people and entities with access to them adequately protected Plaintiffs' and Class Members' Private Information. It likewise owed a duty to Plaintiffs and Class Members to retain as third-party vendors of data security products and services vendors with a history of adhering to industry standards for data security.

341.    Pursuant to the FTC Act, 15 U.S.C. § 45, Marquis had a duty to provide adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

342.    Plaintiffs and Class Members are within the class of persons the FTC Act was intended to protect.

343.    The type of harm that resulted from the Data Breach was the type of harm the FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiffs and Class Members.

344.    Defendants likewise had duties to have processes and procedures in place sufficient for the vetting, hiring, and retention of data security vendors responsible for securing Marquis' network.

345.    Marquis likewise owed a duty to Plaintiffs and Class Members to ensure, prior to hiring SonicWall, that SonicWall had adequate data security, procedures, and protocols sufficient to protect Marquis' network that contained Plaintiffs' and Class Members Private Information from data breaches.

346. Marquis additionally owed a continuing duty to Plaintiffs and Class Members to ensure SonicWall continued to employ adequate data security, procedures, and protocols sufficient to protect Plaintiffs' and Class Members Private Information.

347. Defendants had, and continue to have, duties to timely disclose that Plaintiffs' and Class Members' Private Information within their possession was compromised and precisely the types of information that were compromised.

348. Defendants breached these duties in the following ways: At all relevant times, SonicWall was Marquis' independent contractor. Marquis entrusted SonicWall with backups of its firewall configuration and its employees' MFA credentials, without: (a) properly vetting SonicWall and inquiring about its data security qualifications; (b) inquiring about and/or investigating SonicWall's data security procedures, protocols, and infrastructure; (c) ensuring SonicWall had data security systems and procedures compliant with the FTC Act and recognized industry standards prior to retaining SonicWall; (d) ensuring SonicWall adequately secured and encrypted the backup firewall configurations and MFA credential information in its possession from data breaches prior to retaining SonicWall; (e) have procedures in place for regularly pressure-testing and auditing the performance of the cybersecurity safeguards obtained through third-party vendors including SonicWall; (f) properly and regularly pressure-testing and auditing the performance of SonicWall's firewall products and other cybersecurity products provided to Marquis to ensure they were working properly; (g) failing to ensure SonicWall adequately trained or oversaw its employees responsible for data security before hiring and/or retaining SonicWall; (h) failing to ensure SonicWall had systems and processes in place to swiftly recognize and detect if SonicWall's networks containing the firewall cloud backup products have been compromised; and (i) failing to adequately advise SonicWall of the confidential nature of Plaintiffs' and the

76

Class's Private Information protected by SonicWall's firewall product and its corresponding duty to protect that information.

349. Marquis may be held responsible for SonicWall's negligent acts if: (a) Marquis knew or should have known that SonicWall was incompetent; and (b) a third person was injured because of SonicWall's incompetence.

350. Specifically, Marquis apparently failed to do any reasonable or diligent background vetting or research on SonicWall before purchasing its firewall product and cloud back-up services. If it had performed any reasonable investigation, it would have known of, among others, the following prior allegations of SonicWall's blatant disregard for known vulnerabilities in its firewall products.

351. Specifically, in October 2023, a former chief security officer for SonicWall filed a public lawsuit against SonicWall alleging that he had been fired by SonicWall—rather than thanked—for raising to the attention of leadership security vulnerabilities in a new security product that SonicWall was launching.[47]

352. Furthermore, federal authorities, such as CISA, have repeatedly flagged SonicWall products for critical vulnerabilities that have been previously exploited by ransomware groups. For example, on October 28, 2024, before Marquis entered into its contractual relationship with SonicWall, the Field Effect Security Intelligence Team published a report announcing that multiple ransomware groups were "actively exploiting a critical vulnerability" (which was labeled CVE-2024-40766) in SonicWall's products, including its firewalls. The report further noted that "[i]n early September 2024, the Cybersecurity and Infrastructure Security

---

[47] *Ex-security chief says SonicWall fired him for noting vulnerability*, Daily Journal (Oct. 23, 2023), https://www.dailyjournal.com/article/375327-ex-security-chief-says-sonicwall-fired-him-for-noting-vulnerability

Agency (CISA) listed CVE-2024-40766 [the SonicWall vulnerability] in its Known Exploited Vulnerabilities (KEV) catalog and ordered U.S. federal agencies to patch affected systems[.]"[48]

353.    Furthermore, it is known in the industry, and had been publicly reported by Field Effect in its October 2024 article, that "SonicWall devices have a history of being targeted by ransomware groups," and went on to list examples.[49]

354.    If Marquis had undertaken a reasonable investigation into the adequacy of SonicWall's compliance with industry standards in its cybersecurity product and service offerings prior to selecting, retaining, and hiring SonicWall, Marquis would have known that SonicWall was incompetent and incapable of adequately protecting and securing Plaintiffs' and the Class's Private Information through its firewall products and services.

355.    However, Marquis was negligent and failed to exercise the requisite standard of care in the hiring, selecting, and retaining of SonicWall.

356.    Marquis, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to exercise reasonable care in vetting, hiring, and retaining SonicWall to help protect the security of Plaintiffs' and the Class's Private Information.

357.    Marquis, through its actions and/or omissions, unlawfully breached its duties to Plaintiffs and Class Members by failing to have appropriate hiring and vetting procedures in place for selecting a cybersecurity vendor to protect Marquis' network.

358.    But for Defendant Marquis' negligent conduct and each breach of the duties enumerated above, Plaintiffs' and Class Members' PII would not have been compromised, the

---

[48] Field Effect Security Intelligence Team, *Critical SonicWall vulnerability exploited by ransomware groups*, Field Effect (Oct. 28, 2024), https://fieldeffect.com/blog/critical-sonicwall-vulnerability-exploited-by-ransomware-groups
[49] *Id.*

Data Breach would not have occurred, or if the Data Breach had occurred, the harms therefrom would have been substantially mitigated.

359. It was foreseeable that Defendant Marquis' failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches.

360. It was foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would result in injuries to Plaintiffs and Class Members.

361. Defendant Marquis' breach of duties owed to Plaintiffs and Class Members caused Plaintiffs' and Class Members' Private Information to be compromised.

362. As a direct and proximate result of Defendant Marquis' negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) lost or diminished value of their Private Information; (b) actual identity theft and fraud; (c) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to uncompensated lost time; (d) loss of benefit of their bargain; and (e) the continued and certainly increased risk to their Private Information, which remains in Defendants' possession and subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect it.

363. As a further result of Defendant Marquis' negligence and breach of duties, Plaintiffs and Class Members remain in danger of imminent harm in that their Private Information, which is still in the possession of third parties, will be used for fraudulent purposes, and Plaintiffs and Class Members have and will suffer damages including: a substantial increase in the likelihood of identity theft; the compromise, publication, and theft of their personal

79

information; loss of time and costs associated with the prevention, detection, and recovery from unauthorized use of their personal information; the continued risk to their personal information; future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the personal information compromised as a result of the Data Breach; and overpayment for the services or products that were received without adequate data security.

364.    As an additional direct and proximate result of Defendant Marquis' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, and other economic and non-economic losses.

## COUNT III
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class against Defendant Marquis)

365.    Plaintiffs incorporate the allegations in Paragraphs 1 through 279 above as if fully set forth herein.

366.    Plaintiffs bring this claim individually and on behalf of the Class Members, and in the alternative where necessary.

367.    Plaintiffs and Class Members conferred a benefit upon Defendant Marquis by providing Defendant with their Private Information. Specifically, they provided their Private Information (either directly or indirectly) to Defendant Marquis, which Defendant Marquis' clients required Plaintiffs and Class Members to provide in order to receive financial services. Indeed, Defendant Marquis generated revenue and was paid specifically to store, manage, analyze, use, and report on Plaintiffs' and Class Members' Private Information.

368.    Defendant Marquis appreciated or had knowledge of the benefits conferred upon it by Plaintiffs. Defendant Marquis also benefited from the receipt of Plaintiffs' and Class Members' Private Information. Defendant Marquis profited from Plaintiffs' retained data and

used Plaintiffs' and Class Members' Private Information for business purposes and to generate revenue, including by using the Private Information for the specific functions contracted for by Marquis' Clients.

369. Defendant Marquis failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not fully compensate Plaintiffs or Class Members for the value that their Private Information provided.

370. Defendant Marquis enriched itself by saving the costs it reasonably should have expended on security measures to protect Private Information while profiting from collecting, storing, using, and sharing that same data. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant Marquis calculated to increase its own profits at the expense of Plaintiffs and Class Members by using cheaper, ineffective security measures, and diverting those funds to Defendant Marquis' own pocket.

371. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant Marquis' decisions to prioritize its own profits over the requisite security and the safety of Plaintiffs' and Class Members' Private Information.

372. Therefore, under principles of equity and good conscience, Defendant Marquis should not be permitted to retain the full value of Plaintiffs' and the Class Members' Private Information because Defendant Marquis failed to adequately protect their Private Information. Plaintiffs and the proposed Class would not have provided their Private Information to Defendant Marquis had they known Defendant Marquis would not adequately protect their Private Information.

373. Defendant Marquis should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds received by them

because of their misconduct and the Data Breach it caused.

**COUNT IV**
**VIOLATION OF THE CALIFORNIA CONSUMER PRIVACY ACT**
**Cal. Bus. & Prof. Code §§ 1798.150 *et seq.* ("CCPA")**
**(On Behalf of Plaintiffs Bowles, Hamisch, Ridout and the California Subclass against Defendant Marquis)**

374.     Plaintiffs Bowles, Hamisch, and Ridout ("Plaintiffs" for purposes of this Count) incorporate the allegations in Paragraphs 1 through 279 above as if fully set forth herein.

375.     Plaintiffs bring this claim individually and on behalf of the California Subclass Members against Defendant Marquis.

376.     Defendant Marquis violated California Civil Code § 1798.150 (the "CCPA") by failing to implement and maintain reasonable security procedures and practices appropriate to protect the Private Information of California Plaintiffs and the California Subclass. As a direct and proximate result, California Plaintiffs' and the California Subclass' Private Information was subject to unauthorized access and exfiltration, theft, or disclosure.

377.     Defendant Marquis is a "business" under the meaning of California Civil Code § 1798.140(d) because Defendant Marquis is a "corporation[s], association[s], or other legal entit[ies] that [are] organized or operated for the profit or financial benefit of [their] shareholders or other owners" that "collect consumers' Private Information" and are active "in the State of California" and "had annual gross revenues in excess of twenty-five million dollars ($25,000,000) in the preceding calendar year."

378.     Plaintiffs and the California Subclass seek injunctive or other equitable relief to ensure Defendant Marquis hereinafter adequately safeguard Private Information by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant Marquis continues to hold Private Information, including Plaintiffs' and the California

82

Subclass's Private Information. Plaintiffs and the California Subclass have an interest in ensuring that their Private Information is reasonably protected, and Defendant Marquis has demonstrated a pattern of failing to adequately safeguard this information.

379.  On March 2, 2026, Defendant Marquis was sent written notice of their violations pursuant to Cal. Civ. Code § 1798.150 by Plaintiffs Bowles and Hamisch. If Defendant Marquis cannot cure within 30 days, then Plaintiffs intend to promptly amend this Complaint to seek all relief available under the CCPA including damages to be measured as the greater of actual damages or statutory damages in an amount up to seven hundred and fifty dollars ($750) per consumer per incident. See Cal. Civ. Code § 1798.150(a)(1)(A) & (b).

380.  Plaintiffs now seek actual damages and injunctive relief as a result of Defendant Marquis' violations described herein.

381.  As described herein, an actual controversy has arisen and now exists as to whether Defendant Marquis implemented and maintained reasonable security procedures and practices appropriate to the nature of the information so as to protect the Private Information under the CCPA.

382.  A judicial determination on this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant Marquis.

**COUNT V**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class against all Defendants)**

383.  Plaintiffs incorporate by reference and re-alleges each and every allegation set forth above in paragraphs 1 through 279, as though fully set forth herein.

384.  Plaintiffs bring this claim individually and on behalf of the Class Members.

385.  Under the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., this Court is

authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary supplemental relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

386.    In the fallout of the Data Breach, a controversy has arisen about: (a) SonicWall's duties to use reasonable data security for the firewall cloud backup products and services it offers to customers; (b) Marquis' duties to use vendors and/or independent contractors with reasonable data security for the Private Information it collects and maintains; and (c) both defendants' duties to comply with their obligations and promises to take reasonable measures to secure Plaintiffs' and Class Members Private Information.

387.    On information and belief, Defendants' actions were—and still are—inadequate and unreasonable. Plaintiffs and Class Members continue to suffer injuries from the ongoing threat of fraud and identity theft due to both defendants' inadequate data security measures and Marquis' failure to use vendors and/or independent contractors with adequate data security measures.

388.    Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring as follows:

      a.  SonicWall owed—and continues to owe—a legal duty to use reasonable data security to secure the networks of its customers, including Marquis, to whom Private Information has been entrusted;

      b.  Marquis owed—and continues to owe—a legal duty to ensure any vendors and/or contractors it hires use reasonable data security to secure the Private Information entrusted to it;

      c.  Defendants have a duty to notify impacted individuals of the Data Breach under

common law, Section 5 of the FTC Act, and HIPAA;

d.  SonicWall breached, and continues to breach, its duties by failing to use reasonable measures to protect the networks of customers, including Marquis, which collect and manage Private Information entrusted to it from unauthorized access, use, and disclosure;

e.  Marquis breached, and continues to breach, its duties by failing to ensure the vendors and/or contractors it utilizes, including SonicWall, deploy adequate data security and/or by willingly using vendors and/or contractors who fail to use reasonable measures to protect the Private Information; and

f.  Defendants' breaches of their duties caused—and continue to cause—injuries to Plaintiffs and Class Members.

389.    The Court should also issue injunctive relief requiring SonicWall to use adequate data security consistent with industry standards, requiring Marquis to use vendors and/or independent contractors with adequate security consistent with industry standards, and requiring Marquis to implement protocols to ensure adequate data security with respect to the Private Information in its custody and care.

390.    Defendants have provided no information or confirmation that the vulnerabilities that led to this Data Breach have been rectified, leaving Plaintiffs' and Class Members' data still at risk from this Data Breach.

391.    If an injunction is not issued, the resulting hardship for Plaintiffs and Class Members far exceeds the minimal hardship that Defendants could experience if an injunction is issued.

392.    An injunction would benefit the public by preventing further injuries to Plaintiffs,

Class Members, and the public at large.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendants, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Class and their counsel as Class Counsel;

(b)    For an order declaring that Defendants' conduct violates the laws referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(d)    For damages in amounts to be determined by the Court and/or jury;

(e)    For an award of statutory damages or penalties to the extent available;

(f)    For an award of attorneys' fees and costs as allowed by law;

(g)    For pre-judgment interest on all amounts awarded;

(h)    For an order of restitution and all other forms of monetary relief; and

(i)    Such other and further relief as the Court deems necessary and appropriate.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 23, 2026                                 Respectfully submitted,

By: */s/ Joe Kendall*
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 825
Dallas, Texas 75219

86

Tel: 214/744-3000
Fax: 214/744-3015
jkendall@kendalllawgroup.com

*Interim Liaison Counsel for Plaintiffs*

W. Mark Lanier
**LANIER LAW FIRM**
10940 W. Sam Houston Pkwy. N., Suite 100
Houston, TX 77064
Tel: 713-659-5200
mark.lanier@lanierlawfirm.com

Gary M. Klinger
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.: (866) 252-0878
gklinger@milberg.com

Jeff Ostrow
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, FL 33301
Tel: 954-525-4100
ostrow@kolawyers.com

*Interim Co-Lead Class Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served on all counsel of record

on March 23, 2026 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

/s/ *Joe Kendall*
JOE KENDALL

87